**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| G. BRUCE GLANVILLE, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-08-2537 |
| | § | |
| DUPAR, INC., *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

In this suit under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 *et seq.*, the plaintiffs, G. Bruce Glanville, Clifford Cook, and Brent Wiggins, sued Dupar, Inc., Dupar Properties, Inc., and J. Kelly Parsons (together, "Dupar"), alleging a failure to pay overtime. Dupar provides delivery and installation service for General Electric ("GE") appliances. The plaintiffs signed independent contractor agreements with Dupar and drove their own trucks and trailers to deliver the GE appliances to customers. In the complaint, the plaintiffs alleged that they are entitled to unpaid overtime because Dupar improperly classified them as "independent contractors rather than employees." (Docket Entry No. 1 at ¶ 23).

The plaintiffs sued "on their behalf and on behalf of other delivery drivers and installers and other similarly situated workers for Defendants at any time from August 20, 2005 to" August 20, 2008. (*Id.* at ¶ 7). The plaintiffs moved for conditional certification and notice to potential plaintiffs under § 216(b) of the FLSA. (Docket Entry No. 19). The parties agreed to extend Dupar's response deadline to conduct discovery on Dupar's defense that the Motor Carrier Act ("MCA") exemption from the FLSA applies and requires dismissal of this case. *See* 29 U.S.C. § 213(b)(1). (Docket

Entry No. 22).  That discovery has been completed and Dupar has moved for summary judgment on the basis of the motor carrier exemption.  (Docket Entry No. 32).[1]  Dupar argues that even assuming the plaintiffs were its employees and not independent contractors, the MCA exempts the plaintiffs, as drivers in interstate commerce, from the FLSA.  (*Id.*).  The plaintiffs responded, (Docket Entry No. 35), Dupar replied, (Docket Entry No. 39), and the plaintiffs responded to the reply, (Docket Entry No. 41).  This court heard oral argument on the summary judgment motion on September 22, 2009.

Based on a careful review of the pleadings; the motions, responses, and replies; the evidence in the record; the arguments of counsel; and the applicable law, this court grants Dupar's motion for summary judgment.  The undisputed facts in the record show, as a matter of law, that the motor carrier exemption applies and that the plaintiffs are not entitled to overtime compensation under the FLSA.  The plaintiffs' motion for class certification is denied as moot.  The reasons for these rulings are explained below.

## I.    Background

Dupar was formed in Houston, Texas in 1958 as an independently owned local delivery agent for GE, which manufactures appliances at more than 80 locations worldwide.  (Docket Entry No. 32, Ex. 1, Declaration of J. Kelly Parsons, Co-Owner of Dupar, at ¶ 4).  GE arranges for the transportation of its appliances from the factory to the customer by using Appliance Distribution Centers ("ADCs") across the United States and local delivery agents like Dupar.  (Docket Entry No.

---

[1]  The parties have stipulated that Dupar has not waived its defense or argument that the plaintiffs were not entitled to overtime because they were independent contractors.  (Docket Entry No. 34). Dupar has responded to the plaintiffs' motion for class certification, (Docket Entry No. 33), and the plaintiffs replied, (Docket Entry No. 40).  The parties asked this court to rule on the summary judgment motion before deciding whether conditional certification was appropriate.

32, Ex. 2, Declaration of Roy Toutant, GE General Manager for Appliances Fulfillment, at ¶ 3).  The ADC in Dallas, Texas facilitates GE's deliveries to all of Texas and Oklahoma as well as parts of Arkansas, Louisiana, Missouri, and New Mexico.  (*Id.*).  GE decides what appliances and how many of each to send to the Dallas ADC based on a forecast of sales to the customers in those areas.  (*Id.* at ¶ 4).  The sales forecasts are updated weekly, and GE's shipping decisions are adjusted accordingly.  (*Id.*).  GE maintains a "safety stock" of appliances, consisting of one to six weeks' worth of anticipated demand.  (*Id.* at ¶ 5).  The objective is to have enough appliances available to meet the anticipated orders while minimizing the time appliances are at the ADC.  (*Id.*).  Appliances can be sent out for delivery to the customer the day they arrive at the Dallas ADC.  (*Id.* at ¶ 6).  On average, appliances are sent out for delivery to the customer within four weeks of arriving in Dallas. (*Id.*).  The appliances are not processed or modified in Dallas except to repackage appliances that arrive in damaged cartons.  (*Id.* at ¶ 7).

Dupar contracts with GE to handle the last shipment leg in the Houston, Texas area by delivering appliances to the customers.  (*Id.* at ¶ 9).  GE maintains real-time information about the movement of each appliance until it is delivered to the customer.  (*Id.*).  GE retains title and control over all the appliances it ships until they are delivered to the customer.  (*Id.*).  Dupar provided the delivery service through individual drivers like the plaintiffs, who entered into independent contractor agreements with Dupar.  (Docket Entry No. 32, Ex. 1, Parsons Declaration at ¶ 6).  The plaintiffs delivered the GE appliances using their own trucks and trailers.  (*Id.*).  The plaintiffs drove pickup trucks hauling a 16- or 20-foot trailer loaded with appliances, including refrigerators and washers and dryers.  GE paid Dupar for completing the deliveries to the customer and Dupar, in turn, paid the plaintiffs for their services.  (*Id.* at ¶ 8).

Several individuals have filed a notice of consent to become a plaintiff in this case, including Byron Boling, Anthony Tullos, Kenneth Tullos, Kyle E. Blankenship, and Joe Randall Young. (Docket Entry Nos. 9, 10, 11, 12, 13, 30).  On September 9, 2009, this court granted the plaintiffs' unopposed motion for leave to amend the complaint to add these individuals as plaintiffs.  (Docket Entry No. 37).

The plaintiffs allege that they are entitled to unpaid overtime compensation under the FLSA because Dupar improperly classified them as independent contractors instead of employees.  Dupar argues that summary judgment on the plaintiffs' FLSA claims is appropriate because even assuming they were employees, they were drivers of "commercial motor vehicles" in interstate commerce and subject to the motor carrier exemption to the FLSA.  The plaintiffs respond that because their vehicles did not "weigh" more than 10,000 pounds, they did not drive "commercial motor vehicles" that would subject them to regulation by the Secretary of Transportation and exempt them from the FLSA.  The MCA exemption is examined below.

## II.    The Legal Standard for Summary Judgment

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Triple Tee Golf*, *Inc. v. Nike*, *Inc.*, 485 F.3d 253, 261 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *See Celotex*, 477 U.S. at 325.  While the party

moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402 F.3d 536, 540 (5th Cir. 2005) (citation omitted). "A fact is 'material' if its resolution in favor of one party might affect the outcome of the lawsuit under governing law." *Sossamon v. Lone Star State of Texas*, 560 F.3d 316, 326 (5th Cir. 2009) (quotation omitted). "If the moving party fails to meet [its] initial burden, the motion [for summary judgment] must be denied, regardless of the nonmovant's response." *United States v. $92,203.00 in U.S. Currency*, 537 F.3d 504, 507 (5th Cir. 2008) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate how that evidence supports that party's claim. *Baranowski v. Hart*, 486 F.3d 112, 119 (5th Cir. 2007). "This burden will not be satisfied by 'some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.'" *Boudreaux*, 402 F.3d at 540 (quoting *Little*, 37 F.3d at 1075). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Connors v. Graves*, 538 F.3d 373, 376 (5th Cir. 2008).

## III.    Analysis

The FLSA requires employers to pay employees at time-and-a-half for any time worked in excess of forty hours per week. *See* 29 U.S.C. § 207(a). The FLSA exempts from this requirement "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of" the MCA. *Id.* § 213(b)(1). The exemption is to eliminate any conflict between the Department of Labor's

5

jurisdiction over the FLSA and the mutually exclusive jurisdiction exercised by the Department of Transportation over the MCA. For example, by encouraging drivers to earn overtime through provisions compensating overtime at one and one-half times the regular pay rate, the FLSA may undermine safety regulations intended to limit the number of continuous hours drivers may be on the road. *See Walters v. American Coach Lines of Miami, Inc.*, 575 F.3d 1221, 1226 (11th Cir. 2009); *Levinson v. Spector Motor Serv.*, 330 U.S. 649, 657, 67 S.Ct. 931, 91 L.Ed. 1158 (1947). Section 13501 of the MCA gives the Secretary of Transportation jurisdiction over motor carriers and § 31502 empowers the DOT to set qualifications and hours for employees of a motor carrier. 49 U.S.C. § § 13501, 31502. The motor carrier exemption applies to any employee for whom the Secretary has authority to regulate qualifications and maximum hours of service, regardless of whether the Secretary has exercised that authority. *Id.*; *see also Barefoot v. Mid-America Dairymen, Inc.*, 1994 WL 57686 at *2 (5th Cir. Feb.18, 1994); *Bilyou v. Dutchess Beer Distribs., Inc.*, 300 F.3d 217, 229 (2d Cir. 2002).

Exemptions under the FLSA are construed narrowly and against the employer. *Barefoot*, 1994 WL 57686, at *2; *see also Songer v. Dillon Resources, Inc.*, - - - F.Supp.2d - - - -, 2009 WL 2135791, at *4 (N.D. Tex. July 15, 2009). The employer has the burden to prove that the exemption applies. *Id.* For the motor carrier exemption to apply, the employee must be employed by a motor carrier subject to the jurisdiction of the Secretary of Transportation, and the employee must be "engaged in activities of a character directly affecting the safety of operations of motor vehicles in the interstate transportation of passengers and property." 29 C.F.R. § 782.2.

**A.     Is Dupar a "Motor Carrier" Subject to the Secretary of Transportation's Jurisdiction?**

The motor carrier exemption applies to drivers employed by a "motor carrier." Before August 2005, the motor carrier exemption applied to all drivers operating in interstate commerce, regardless of the weight of the vehicle driven. *See* 49 U.S.C. § 13102 (2002) ("motor carrier" as used in 49 U.S.C. § 31502(b) meant simply "a person providing motor vehicle transportation for compensation."). On August 10, 2005, Congress passed the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users ("SAFETEA-LU"), which amended key definitions relating to the motor carrier exemption. *See* Pub.L. No. 109-59, 199 Stat. 1144 (2005). "Motor carrier" was redefined as a "person who provides *commercial* motor vehicle transportation for compensation." 49 U.S.C. § 13102(14) (emphasis added). "Commercial motor vehicle" was defined, in relevant part, as "a self-propelled or towed vehicle used on the highways in interstate commerce to transport passengers or property, if the vehicle-(A) has a gross vehicle weight rating or gross vehicle weight of at least 10,001 pounds whichever is greater." 49 U.S.C. § 31132(1). On June 6, 2008, Congress restored the pre-SAFETEA-LU definition of "motor carrier" when it passed the SAFETEA-LU Technical Corrections Act of 2008 ("TCA"), Pub.L. No. 110-244, §§ 305-06, 122 Stat. 1572, 1620-21 (2008). The TCA reconfirmed that the MCA exemption does not apply to drivers operating motor vehicles that weigh 10,000 pounds or less. 110 P.L. 244, § 306; 122 Stat. 1572, 1620-21 (2008); *see also Brooks v. Halsted Comm'ns Ltd.*, 620 F.Supp.2d 193, 197–98 (D. Mass. 2009). The plaintiffs in this case seek unpaid overtime compensation for the period from August 20, 2005 to August 20, 2008, straddling the effective date of the TCA.

Dupar submitted the affidavit of J. Kelly Parsons, who owns Dupar with his sister. Parsons states that "Dupar is a motor carrier subject to the authority of the Federal Motor Carrier Safety

7

Administration ("FMCSA") of the Department of Transportation, and operates pursuant to Federal Operating Authority issued by the FMCSA." (Docket Entry No. 32, Ex. 1, Declaration of J. Kelly Parsons, at ¶ 3). Dupar provides "regulated for-hire transportation services for GE in Texas and Louisiana." (*Id.*, ¶ 5).

The plaintiffs argue that the motor carrier exemption does not apply to them because neither the trucks they drove nor the attached trailers had a gross vehicle weight rating or a gross vehicle weight of more than 10,000 pounds. The defendants argue that the exemption does apply because the combined weight of the truck each plaintiff drove and the attached trailer exceeded 10,000 pounds.

The MCA does not define gross vehicle weight rating ("GVWR") or gross vehicle weight ("GVW"). The plaintiffs cite a "Wikipedia" entry that defines GVWR as "the maximum allowable total weight of a road vehicle or trailer when loaded– i.e. including the weight of the vehicle itself plus fuel, passengers, cargo, and trailer tongue weight." (Docket Entry No. 35, at 5). The plaintiffs also cite *Royal Kunia Cmty. Ass'n ex rel. Bd. of Dirs. v. Nemoto*, 198 P.3d 700, 706 n.9 (Haw. Ct. App. 2008), and an online Ford Motor Vehicles Glossary, for the proposition that the GVW of a truck and attached trailer is calculated as "the curb weight of the vehicle, plus the tongue weight of any trailer attached thereto." (Docket Entry No. 35, at 6). Relying on an online U-Haul Towing Glossary, the plaintiffs assert that the "tongue weight" of a trailer is "the weight the tongue of the trailer places on the back of the vehicle which is towing it." (*Id.*). According to the plaintiffs, "[a] reasonable approximation of the tongue weight is ten percent of the loaded trailer weight." (*Id.*). Using these definitions of GVWR and GVW, the plaintiffs submitted affidavits in which they stated that the weights of their vehicles and trailers were limited to the vehicle weight and ten percent of

the loaded attached trailer weight.  (Docket Entry No. 35, Exs. A, B, C, D).  According to the plaintiffs, their "pickup trucks did not have a GVWR in excess of 10,000 pounds" and "the GVW, even when adding the tongue weight of the trailers, fully loaded with appliances, did not exceed 10,000 pounds."  (*Id.* at 6).

Dupar's approach is consistent with the DOT regulations promulgated under the MCA.  The plaintiffs' approach is contrary to the regulation, which is consistent with the statute, and has no reliable support.[2]  Neither the MCA nor its implementing regulations use the term "trailer tongue weight."  Although GVWR is not defined in the MCA, the DOT regulations define GVWR as "the value specified by the manufacturer as the loaded weight of a *single* motor vehicle."  49 C.F.R. § 390.5 (emphasis added).  According to the DOT, the GVWR is only  appropriate for determining the weight of a vehicle that is not towing a trailer.  The DOT regulations account for both situations when a vehicle is towing a trailer and when it is not.  The DOT regulations define "commercial motor vehicle" as one which "[h]as a gross vehicle weight rating or *gross combination weight rating,* or gross vehicle weight or *gross combination weight*, of 4,536 kg (10,001 pounds) or more, *whichever is greater*."  49 C.F.R. § 390.5 (emphasis added).  GCWR is defined as "the value specified by the manufacturer as the loaded weight of a combination (articulated) motor vehicle. In the absence of a value specified by the manufacturer, GCWR will be determined by adding the GVWR of the power unit and the total weight of the towed unit and any load thereon."  49 C.F.R. § 390.5.  The plaintiffs in this case were not driving a "single vehicle," but a "power unit" and a "towed unit" combined.  Under the DOT regulations, to determine the GCWR of each plaintiff's

---

[2]  Wikipedia is an inherently unreliable source.  *See Performance Pricing*, *Inc. v. Google*, *Inc.*, 2009 WL 2497102, at *12 n.15 (E.D. Tex. Aug. 13, 2009) ("The content on this website is provided by volunteers from around the world-anyone with internet access can provide or modify content.  Thus, not only is the information unreliable, but it can potentially change on a day-to-day basis.") (internal citations omitted).

truck towing a trailer, the GVWR of each truck must be added to the weight of the trailer being towed with its cargo.[3]

The DOT's interpretation of the applicable regulation, 49 C.F.R. § 390.5, also states that GCWR is the appropriate measure when determining whether a truck towing a trailer is a "commercial motor vehicle" subject to the Federal Motor Carrier Safety Regulations issued by the Secretary of Transportation:

> Question:   A Company has a truck with a GVWR under 10,001 pounds towing a trailer with a GVWR under 10,001 pounds. However, the GVWR of the truck added to the GVWR of the trailer is greater than 10,001 pounds. Would the company operating this vehicle in interstate commerce have to comply with the FMCSRs?
>
> Guidance:   § 390.5 of the FMCSRs includes in the definition of CMV [commercial motor vehicle] a vehicle with a GVWR or GCWR of 10,001 or more pounds. The section further defines GVWR as the value specified by the manufacturer as the loaded weight of a combination (articulated) vehicle. Therefore, if the GVWR of the truck added to the GVWR of the trailer exceeds 10,001 pounds, the driver and vehicle are subject to the FMCSRs.

DOT Interpretations, 49 C.F.R. § 390.5, Question 11.

The DOT is not alone in this interpretation. Courts have cited this regulation and followed the DOT's approach to calculating GCWR when determining whether a pickup truck towing a trailer is over 10,000 pounds and therefore a "commercial motor vehicle" under the MCA. *See Highsmith v. Tractor Trailer Serv.*, 2005 WL 6032882, at *5 (N.D. Ga. Nov. 21, 2005) (concluding, based on 49 C.F.R. § 390.5, that a 1995 GMC Sierra pickup truck towing a trailer was a commercial motor vehicle because the GCWR, calculated as the GVWR of the truck plus the weight of the trailer and

---

[3] The "Ford Motor Glossary" relied on by the plaintiffs supports this conclusion. It states that GCWR is the "[w]eight specified by the manufacturer as the maximum loaded weight of a towing vehicle and its trailer. The sum of the loaded vehicle weight of the truck and trailer should not exceed the GCWR. GCWR = vehicle curb weight + payload + trailer weight + driver and passengers." (Docket Entry No. 35, Ex. E).

its cargo, was greater than 10,000 pounds); *United States v. Triska*, 574 F.Supp.2d 1208, 1215 (D. Kan. 2008) (concluding that a pickup truck with a GVWR of 8,800 pounds was a commercial motor vehicle, as defined under Kansas law and 49 C.F.R. § 390.5, because its GCWR was greater than 10,000 pounds; the truck was towing a trailer that weighed 4,374 pounds and was loaded with cargo weighing 1,373 pounds). The existence of a separate manufacturer specification for GCWR, intended for a combination vehicle (truck towing a trailer), is also telling. The DOT, vehicle manufacturers, and courts all use GCWR, as opposed to GVWR, when a truck is towing a trailer. This court finds the DOT interpretation of 49 C.F.R. § 390.5 persuasive. Agency interpretations are entitled to deference to the extent that they have the power to persuade. *Christensen v. Harris County*, 529 U.S. 576, 587, 120 S.Ct. 1655 (2000).

The plaintiffs argue that 49 C.F.R. § 390.5 is an invalid regulation because it includes GCWR, which is not in the statute. The plaintiffs argue that the regulation changes the statutory definition of "commercial motor vehicle" and is invalid as inconsistent with the statute. According to the plaintiffs, because GVWR is not defined in the statute, its ordinary meaning controls. The plaintiffs argue that because the ordinary meaning of GVWR includes the tongue weight of an attached loaded trailer but not the weight of the loaded trailer, this is what Congress contemplated when it defined a "commercial motor vehicle" as including vehicles with a GVWR of 10,000 pounds or more. The plaintiffs contend that adding GCWR as a measurement is against congressional intent because it "has the effect of bringing motor vehicles under the jurisdiction of the Motor Carrier Act ("MCA") which Congress never intended" — ordinary pickup trucks with a GVWR of less than 10,000 pounds whenever they haul a trailer with a weight combined with the truck of more than 10,000 pounds. (Docket Entry No. 41, at 4). The plaintiffs also argue that adding the term GCWR

makes the term GVWR superfluous because GCWR – which combines the truck and trailer weights – will always be greater than the truck with the tongue weight of the attached trailer.

A court does not defer automatically to an agency's interpretation of a statute. The process for determining whether to give deference to DOT's definition of "commercial motor vehicle" is outlined in *Chevron U.S.A.*, *Inc. v. Natural Resources Defense Council*, *Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). This court must first consider whether Congress has directly spoken to the question at issue. *See Chevron*, 467 U.S. at 842, 104 S.Ct. 2778. "If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43, 104 S.Ct. 2778. If the statute is silent or ambiguous, deference to the agency's interpretation is usually appropriate unless that interpretation is arbitrary and capricious. *Id.* at 843-44, 104 S.Ct. 2778.

The MCA definition of "commercial motor vehicle" does not directly and unambiguously speak to the combination of a truck towing an attached trailer. "Commercial motor vehicle" is defined in the statute as "a self-propelled *or* towed vehicle used on the highways in interstate commerce to transport passengers or property, if *the* vehicle-(A) has a gross vehicle weight rating or gross vehicle weight of at least 10,001 pounds whichever is greater." 49 U.S.C. § 31132(1) (emphasis added). The statute identifies a "self-propelled" or a "towed vehicle." A self-propelled truck with no towed trailer that weighs more than 10,000 pounds is clearly covered under the statutory definition. A 10,001 pound trailer is clearly covered, regardless of the weight of the truck hauling it. The statute clearly contemplates a combination of a self-propelled vehicle with a towed attachment that could not travel down the highway by itself. The plaintiffs' proposed construction of the statute would create a gap in which a truck towing a trailer would not be covered as a

"commercial vehicle" if the truck and tongue weight of the trailer each weighed less than 10,000 pounds, even if together the truck and trailer weighed far more.  Under the plaintiffs' proposed statutory definition, such a vehicle would not be subject to DOT safety regulations and maximum hours of service because neither the "self-propelled" vehicle nor the "towed vehicle" would be a "commercial motor vehicle."  Using the plaintiffs' proposed definition of GVWR, a truck with a curb weight of 7,500 pounds (much larger than a standard pickup truck) towing a loaded trailer that weighed as much as 20,000 pounds would not be a "commercial motor vehicle" subject to DOT safety regulations.  Because the trailer tongue weight would only be 2,000 pounds, the truck's GVWR would be under 10,000 pounds.  Congress could not have intended that such a vehicle would not be subject to the highway safety requirements promulgated by the Secretary of Transportation.  The DOT's regulations account for a situation on which the statute is silent or ambiguous.

The plaintiffs' argument that using the GCWR for determining when a self-propelled and a towed vehicle are covered as a "commercial motor vehicle" is overinclusive because it would "sweep up" drivers of ordinary pickup trucks is unpersuasive.  The GCWR would only apply when the combined weight exceeds 10,000 pounds and the motor carrier is transporting passengers or property in interstate commerce.  *See* 49 U.S.C. § 13501.  The plaintiffs' argument that the statute contemplated only the tongue weight of the towed vehicle is unpersuasive in part because it is so underinclusive.  The plaintiffs' argument that adding GCWR to the definition of commercial motor vehicle makes GVWR superfluous is similarly unpersuasive.  The addition of GCWR clarified how the statute applied to self-propelled vehicles with a towed vehicle attached.  GVWR is not superfluous because it continues to apply to a self-propelled vehicle that is not towing an attached trailer.

The parties did not cite, and this court did not find, cases invalidating the DOT regulation defining "commercial motor vehicle" because it included vehicles with a GCWR of more than 10,000 pounds. The definition is consistent with the statute even as the plaintiffs read it because the definition accounts for combination vehicles, which are clearly contemplated by the statute. The existence of a manufacturer-specified GCWR is telling. The DOT's regulation defining commercial motor vehicle for purposes of the MCA, 49 C.F.R. § 390.5, is not arbitrary, capricious, or manifestly contrary to the statute. This court concludes that the DOT's definition is rational, consistent with the statute, and entitled to *Chevron* deference.

For purposes of determining whether a truck towing a trailer is a "commercial motor vehicle," as defined by the MCA, the weight is properly calculated by adding the GVWR of the truck to the weight of the trailer and cargo.[4] Applying the proper calculation for GCWR, the undisputed evidence in the record shows that the plaintiffs drove vehicles weighing more than 10,000 pounds. Each of the plaintiffs' affidavits establishes that the truck and trailer combinations they used all had a GCWR of more than 10,000 pounds:

- Glanville drove a 2004 GMC Sierra 1500 Pickup with a GVWR of 6,800 pounds. Attached to the truck was a 16-foot low boy trailer with a curb weight of 1,610 pounds. Glanville stated that the trailer would hold no more than 4,000 pounds and that a "typical cargo" was 2,500 pounds. (Docket Entry No. 35, Ex. A, Declaration of G. Bruce Glanville). The GCWR of this combination would be 12,410 pounds.

- Glanville also drove a 1996 Chevrolet 2500 Pickup with a GVWR of 8,600 pounds. Attached to this truck was a 20-foot enclosed trailer with a curb weight of 3,100 pounds and a "maximum payload" of 3,900 pounds. (*Id.*). The GCWR of this combination would be 15,600 pounds.

---

[4] This calculation assumes the absence of a manufacturer-specified GCWR that is listed on the truck. When a GCWR is specified, it controls.

- Cook drove a 2006 Dodge Ram 2500 MegaCab diesel truck with a GVWR of 8,800 pounds. Attached to this truck was a 20-foot enclosed trailer with a a curb weight of 3,100 pounds and a "maximum payload" of 3,900 pounds. (Docket Entry No. 35, Ex. B, Declaration of Clifford Cook). The GCWR of this combination would be 15,800 pounds.

- Cook also drove a 2003 Dodge Ram 1500 Quad Cab diesel truck with a GVWR of 6650 pounds. Attached to this truck was a 16-foot bobtail trailer with a curb weight of 1,500 pounds and a "maximum payload" of 4,100 pounds. (*Id.*). The GCWR of this combination would be 12,250 pounds.

- Wiggins drove a 1997 Chevrolet 2500 HD Extended Cab truck with a GVWR of 8,600 pounds. Attached to this truck was a 16-foot low boy trailer with a curb weight of 1,600 pounds and a maximum payload of 4,100 pounds. (Docket Entry No. 35, Ex. C, Declaration of Brent Wiggins). The GCWR of this combination would be 14,300 pounds.

- Blankenship drove a 2003 GMC Sierra 2500 HD Crew Cab truck with a GVWR of 9,200 pounds. Attached to this truck was a 16-foot low boy trailer with a curb weight of 1,600 pounds and a "maximum pay load" of 6,900 pounds. (Docket Entry No. 35, Ex. D, Declaration of Kyle Blankenship). The GCWR of this combination would be 17,700 pounds.

The evidence in the record does not raise a genuine fact issue material to determining whether the plaintiffs operated vehicles weighing more than 10,000 pounds.

The plaintiffs also argue that even assuming that the GCWR of their trucks towing trailers was more than 10,000 pounds, the TCA places them under the FLSA's coverage after June 6, 2008. The TCA amended the FLSA to state that a "covered employee" is one who works as a driver "affecting the safety of operation of motor vehicles weighing 10,000 pounds or less in transportation on public highways in interstate or foreign commerce." Pub.L. No. 110-244, §§ 305-06, 122 Stat. 1572, 1620-21 (2008). The plaintiffs argue that because the TCA does not use the terms "commercial motor vehicle" or GCWR, they are covered by the FLSA after June 6, 2008 because their vehicles did not weigh more than 10,000 pounds.

Although the TCA does not use the terms "commercial motor vehicle" or GCWR, neither does it use GVWR or GVW. It merely states that a "covered employee" under the FLSA is one who operates motor vehicles "weighing" 10,000 pounds or less. In the absence of a specific definition in the TCA, the ordinary meaning of "weight" controls, which is the actual weight of the truck and loaded trailer. The undisputed evidence in the record shows that the plaintiffs operated vehicles, truck and trailer combined, with an actual weight of greater than 10,000 pounds. The TCA is inapplicable.

The plaintiffs' arguments about Dupar's failure to require commercial driver's licenses ("CDLs") or DOT identification numbers are similarly unpersuasive. A CDL is not required when the vehicle being driven has a GCWR of less than 26,000 pounds. 49 C.F.R. § 383.5. The undisputed evidence in the record shows that none of the plaintiffs were required to have a CDL because none drove a vehicle with a GCWR of greater than 26,000 pounds. Moreover, any violation of DOT regulations by Dupar would not affect whether the motor carrier exemption applies. *See Levinson v. Spector Motor Service*, 330 U.S. 649, 661, 67 S.Ct. 931(1947) ("the Commission's mere possession of that power, whether exercised or not, necessarily excluded all employees, with respect to whom the power existed, from the benefits of the compulsory overtime provisions" of the FLSA); *Barefoot v. Mid-America Dairymen, Inc.*, 1994 WL 57686 at *2 (5th Cir. Feb.18, 1994) ("The Secretary [ ] need only possess the power to regulate the employees at issue; it need not actually exercise that power" for the motor carrier exemption to apply.); *Bilyou v. Dutchess Beer Distributors, Inc.*, 300 F.3d 217, 229 (2d Cir. 2002) (rejecting the argument that an employer's failure to comply with DOT regulations, "including requirements relating to registration, operating authorization, and logging driver hours" estopped employer from arguing it was subject to Secretary

of Transportation's authority).  "The question is not whether [Dupar] intended to be governed by the Department of Transportation or is in fact in compliance with Department of Transportation regulations, but rather whether [Dupar's] activities fall within the motor carrier practices over which the Department of Transportation has power and authority."  *See Collins v. Heritage Wine Cellars*, *Ltd.*, 2008 WL 5423550, at *9 n.5 (N.D. Ill. Dec. 29, 2008).

The undisputed evidence in the summary judgment record shows that the plaintiffs operated vehicles weighing more than 10,000 pounds.  Dupar qualifies as a motor carrier subject to the jurisdiction of the Secretary of Transportation if those vehicles were "used on the highways in interstate commerce to transport passengers or property."  *See* 49 U.S.C. § 31132(1)(A).  This question is examined below.

### B.    Did the Plaintiffs Engage in Activities Affecting the Safety of Motor Vehicles in Interstate Commerce?

The plaintiffs worked as delivery drivers.  A "driver" is an occupation that directly affects the safety of motor vehicles.   *See* 29 C.F.R. § 782.2(b)(1).  Drivers fall under the motor carrier exemption if they "drive[] a motor vehicle in transportation which is, within the meaning of the Motor Carrier Act, in interstate or foreign commerce." 29 C.F.R. § 782.3(1).  For the purpose of the motor carrier exemption, driving in "interstate commerce . . . requires either the actual transport of goods across state lines or the intrastate transport of goods in the flow of interstate commerce." *Barefoot v. Mid-America Dairymen*, *Inc.*, 826 F.Supp. 1046, 1049 (N.D. Tex. 1993) (citing *Merchants Fast Motor Lines*, *Inc. v. I.C.C.*, 528 F.2d 1042, 1044 (5th Cir. 1976)); *see also* 29 C.F.R. § 782.7(b)(1) ("Highway transportation by motor vehicle from one State to another, in the course of which the vehicles cross the State line, clearly constitutes interstate commerce. The result is no different where the vehicles do not actually cross State lines but operate solely within a single State,

if what is being transported is actually moving in interstate commerce.").

It is undisputed that all the transports the plaintiffs completed were between two points inside Texas. "[W]hether the transportation between two points in a single state is interstate or intrastate depends on the shipment's 'essential character.'" *Siller v. L & F Distributors*, *Ltd.*, 109 F.3d 765, *2 (5th Cir. Feb.18, 1997) (citing *Merchants Fast Motor Lines*, *Inc. v. I.C.C.*, 5 F.3d 911, 917 (5th Cir.1993)). "Crucial to determining the shipment's essential character is the shipper's fixed and persistent intent at the time of shipment." *Id.* The determination of a shipper's intent is based on the "totality of the facts and circumstances." *Merchants Fast Motor Lines*, 5 F.3d at 917; *see also Klitzke v. Steiner*, 110 F.3d 1465, 1469 (9th Cir. 1997) ("Whether transportation is interstate or intrastate is determined by the essential character of the commerce, manifested by shipper's fixed and persistent transportation intent at the time of the shipment, and is ascertained from all of the facts and circumstances surrounding the transportation.").

Employers who transport solely within a single state are subject to the Secretary of Transportation's jurisdiction where the transportation is part of a "practical continuity of movement" across state lines. *Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 568, 63 S.Ct. 332, 87 L.Ed. 460 (1943). Once the goods enter into "the channels of interstate commerce," a stop in the movement of the goods does not necessarily mean they are no longer in interstate commerce. *Jacksonville Paper*, 317 U.S. at 568, 63 S.Ct. 332. If the stop represents "a convenient intermediate step in the process of getting them to their final destinations, [the goods] remain 'in commerce' until they reach those points." *Id.*; *see also Siller v. L & F Distributors*, *Ltd.*, 109 F.3d 765, *2 (holding that delivery of goods stored at an in-state warehouse between 6 to 28 days before being delivered to consumer was interstate; "placing goods in a warehouse interrupts, but does not necessarily

18

terminate the goods' interstate journey"); *Foxworthy v. Hiland Dairy Co.*, 997 F.2d 670 (10th Cir.1993) (applying motor carrier exemption to driver making in-state deliveries for dairy company where products were stored no more than three days before delivery, company maintained control over goods during storage, and driver also picked up empty crates for return to out-of-state processing plant); *Roberts v. Leonard W. Levine*, 921 F.2d 804, 814 (8th Cir.1990) (six-month storage period in the company's warehouse did not disrupt the company's fixed and persistent intent that the product continue in interstate commerce to its customers); *cf. Watkins v. Ameripride Servs.*, 375 F.3d 821, 825 (9th Cir. 2004) ("Indefinite storage in a warehouse may transform goods shipped from out-of-state into intrastate deliveries."). The intrastate movement may be part of the "practical continuity of movement" across state lines where the "contract or understanding pursuant to which goods are ordered, like a special order, indicates where it was intended that the interstate movement should terminate." *Jacksonville Paper*, 317 U.S. at 569, 63 S.Ct. 332. A shipper, however, need not ship goods under specific orders for the motor carrier exemption to apply. The Supreme Court has ruled that the exemption may apply when goods are shipped based on an anticipation or understanding of the needs of specific customers. *See id.* at 570 ("[A] wholesaler's course of business based on anticipation of needs of specific customers, rather than on prior orders or contracts," might "be sufficient to establish that practical continuity in transit necessary to keep a movement of goods 'in commerce.'"); *see also Atlantic Indep. Union v. Sunoco, Inc.*, 2004 WL 1368808, at *7 (E.D. Pa. June 16, 2004) (finding that the defendant demonstrated a fixed and persistent intent to ship its product interstate based in part on the fact that defendant determined how much product to ship and when to ship it based on customer demand projections, "taking into

consideration historical need and anticipated weather conditions, rather than solicitation of future sales").

The "totality of the circumstances" test is best summarized in the Department of Transportation's 1992 Policy Statement.  *See* Motor Carrier Interstate Transportation--From Out-of-State Through Warehouses to Points in Same State, 56 Fed.Reg. 19,812 (May 8, 1992).  The Policy Statement sets out the following indicators of the "fixed and persisting intent" necessary to conclude that a trip from an in-state warehouse to the consumer is merely the final leg of an interstate journey:

1.  Although the shipper does not know in advance the ultimate destination of specific shipments, it bases its determination of the total volume shipped through the warehouse on projections of customer demand that have some factual basis, rather than a mere plan to solicit future sales within the State. The factual basis for projecting customer demand may include, but is not limited to, historic sales in the State, actual present orders, relevant market surveys of need.

2.  No processing or substantial product modification of substance occurs at the warehouse or distribution center. However, repackaging (secondary packaging) may be performed.

3.  While in the warehouse, the merchandise is subject to the shipper's control and direction as to the subsequent transportation.

4.  Modern systems allow tracking and documentation of most, if not all, of the shipments coming in and going out of the warehouse or distribution center.

5.  The shipper or consignee must bear the ultimate payment for transportation charges even if the warehouse or distribution center directly pays the transportation charges to the carrier.

6.  The warehouse utilized is owned by the shipper.

7.  "The shipments move through the warehouse pursuant to a storage in transit tariff provision."

*Id.*

The Fifth Circuit has ruled that intrastate deliveries are considered to be in the stream of interstate commerce if the goods originated out of state and the intrastate portion of the route is merely the final phase of an unmistakably interstate transport. *See Merchants Fast Motor Lines*, 5 F.3d at 917 (holding that local drivers operate in interstate commerce "when a shipper ships goods into Texas from another state, temporarily stores the goods at a warehouse in Texas, then later ships the goods to the shipper's Texas customer" using local delivery drivers); *Galbreath v. Gulf Oil Corp.*, 413 F.2d 941, 942, 947 (5th Cir. 1969) (finding that the motor carrier exemption applied to drivers who performed solely intrastate transportation of petroleum products that originated out of the state); *Shew v. Southland Corp.*, 370 F.2d 376 (5th Cir. 1966) (holding that dairy products that originated outside of Texas but stopped temporarily in Dallas were part of a continuous movement in interstate commerce such that the truck drivers who delivered the products locally in Texas were engaged in interstate commerce for purposes of the motor carrier exemption). Some courts applying the motor carrier exemption have held that intrastate deliveries meet the interstate commerce requirement when a product is shipped from out-of-state pursuant to a specific customer order, temporarily stored at an in-state warehouse, and delivered to the customer by the local plaintiff-driver. *See Klitzke v. Steiner*, 110 F.3d 1465, 1469 (9th Cir. 1997) (holding that the motor carrier exemption applied to local delivery driver for linen service that ordered roughly half of the materials it supplied from out-of-state suppliers, based on specific customers orders); *Ballon v. DET Distrib. Co.*, 2006 WL 2035729, at *12 (M.D.Tenn. July 17, 2006) (holding that the motor carrier exemption applied to salesmen for a wholesale beer distributor who drove in-state routes servicing retail sites with products originating from out-of-state brewers because the brewers exerted control over storage conditions and some product was shipped to a distributor's

warehouse based on presales by the brewer directly to large retail customers). Other courts have held that the motor carrier exemption applies in such a circumstance, even in the absence of a specific customer order, when the shipments are made based on anticipated demand. *See, e.g.*, *Musarra v. Digital Dish, Inc.*, 454 F.Supp.2d 692, 713 (S.D.Ohio Sep 28, 2006) (holding that the motor carrier exemption applied where DISH Network shipped equipment to nationwide distribution centers based on forecasts of demand and local delivery drivers delivered goods to the consumer after order was made).

In *Talton v. I.H. Caffey Distributing Co.*, Inc., 124 Fed. Appx. 760 (4th Cir. 2005), the defendant, a North Carolina malt beverage and wine wholesaler/distributor, received beer from various manufacturers inside and outside North Carolina. *Id.* at 762. The beer was delivered from the brewer to the defendant's warehouse, and was then sold and distributed to local retailers. *Id.* The plaintiff drove a delivery truck for the defendant distributor. To determine how much product a retailer needed, the defendant's sales representatives would estimate that retailer's needs by talking to retailer managers or analyzing sales data. *Id.* The Fourth Circuit concluded that the goods were delivered in interstate commerce because "the licensed retailers had an 'understanding' with [defendant] that [defendant] was required to provide them with enough beer to meet their sales needs." *Id.* at 766. The court concluded that the defendant's understanding with the various retailers meant that the temporary stoppage of the beer at the defendant's warehouse did not end its interstate journey. *See id.* at 764–65. The court explained that because the products delivered by the plaintiff delivery-driver were ordered from out of state by the defendant distributor to meet the needs of its in-state customers, the plaintiff transported the goods in interstate commerce. *Id.* at 765.

Similarly, in *Guyton v. The Schwan Food Co.*, 2004 WL 533942 (D. Minn. Mar. 16, 2004), *aff'd*, 125 Fed. App'x 84 (8th Cir. 2005), the court considered whether former sales managers for the defendant, a home-delivery frozen food company, delivered goods in interstate commerce. The defendant shipped food products to one of its four distribution centers in the United States. The products were then shipped to one of the defendant's multiple depots, where they were stored for less than ten days and delivered to the customers. *Id.* at *1-2. The amount of product shipped from the distribution centers to the depots was based on "standing customer orders, historic buying patterns, . . . predicted sales to targeted residential customers," and internet sales. *Id.* The defendant also uploaded the data from each sales order into a central database "that analyze[d] past sales to predict future sales with 95% accuracy." *Id.* at *2. The court concluded that because the food items were shipped from out-of-state to in-state storage facilities on a temporary basis and then distributed to in-state customers, the goods were transported in interstate commerce. *Id.* at *5.

In a case with facts analogous to the present case, the court held that appliances shipped from out of state by Sears to an in-state distribution center and delivered by local drivers were goods transported in interstate commerce. *Ruiz v. Affinity Logistics Corp.*, 2006 WL 3712942 (S.D. Cal. Nov. 9, 2006). The defendant in *Ruiz* was a company that hauled and delivered a variety of products, including appliances, for companies like Sears. The deliveries were made by drivers, including the plaintiff, from the local California warehouse to the customer. The appliances were manufactured at various locations throughout the United States, then shipped to one of the Sears Direct Distribution Centers, and then shipped to a local warehouse to await delivery to customers' homes. The division manager for Sears ordered appliances "based on the forecasting of sales that will be made by the stores." *Id.* at *1. The purpose of the forecasts was to "have enough appliances

available to fill all customer orders without running out of appliances while, at the same time, not stocking any excess inventory." *Id.* On average, appliance remained at the local warehouse between 21 to 28 days. *Id.* at \*5. The evidence in the record showed that Sears owned the local warehouse, maintained control and title of the appliances at all times, did not process or alter the appliances during shipment, and tracked the progress of all shipments electronically. *Id.* at \*5–7. Applying the seven factors outlined in the 1992 DOT Policy Statement, the court concluded that the transportation of the appliances from the local warehouse to the customers' homes "was the last leg of what Sears, at the time of the shipment from the manufacturer, intended to be a journey of the appliances in interstate commerce." *Id.* at \*7. The fact that "some appliances [were] temporarily stored at the DDC" did not change the conclusion that "Sears possesse[d] the requisite 'fixed and persistent intent' that the appliances continue in 'interstate commerce' past the DDC to their 'ultimate destination.'" *Id.* (citation omitted).

Applying the principles from these cases to the evidence in the record leads to the conclusion that the plaintiffs were delivering goods in interstate commerce. The factors set forth in the 1992 DOT Policy Statement support the conclusion that the delivery leg completed by the plaintiffs was part of a "practical continuity of movement" across state lines. GE determines how many and which appliances it sends to the Dallas ADC based on forecasts of sales, specific customer orders, and an "understanding" with its larger customers about the appropriate amount of appliances to satisfy customer demand. (Docket Entry No. 32, Ex. 2, Toutant Declaration, at ¶ 4). GE owns the Dallas ADC and bears ultimate responsibility for payment of transportation costs incurred. (*Id.* at ¶¶ 3, 8). The appliances are not processed or altered at the ADC, they remain subject to GE's control at all times, and they are tracked using real-time information on the progress of each shipment. (*Id.* at ¶¶

24

4, 6, 8, 9). As in *Talton*, *Guyton*, and *Ruiz*, GE ships appliances from the point of manufacture across state lines to a distribution center, where delivery is then completed by a local delivery agent like Dupar. The undisputed facts in the record show that GE intends to ship its goods in interstate commerce and that the delivery completed by the plaintiffs is merely the last phase of an unmistakably interstate shipment. Accordingly, Dupar is a "motor carrier" and the plaintiffs drove "commercial motor vehicles" in interstate commerce.

Based on the undisputed record evidence, this court concludes as a matter of law that the plaintiffs' maximum hours of service were subject to regulation by the Secretary of Transportation, exempting them from the FLSA. Because the plaintiffs are exempt from the FLSA, they are not entitled to unpaid overtime compensation. Summary judgment is granted on the FLSA claims. The plaintiffs' motion for conditional class certification under § 216(b) of the FLSA is denied as moot.

## IV.    Conclusion

Dupar's motion for summary judgment is granted. The plaintiffs' motion for class certification is denied as moot. By **October 15, 2009**, the parties are directed to file a statement with the court identifying any remaining issues and proposing a schedule for resolving them or, if no issues remain, to submit a proposed final judgment.

SIGNED on September 25, 2009, at Houston, Texas.

Lee H. Rosenthal
United States District Judge

25